

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00044-CV

_____

ULYSSES ASSET SUB I, LLC, Appellant

V.

SINCLAIR HOLDINGS, LLC, Appellee

On Appeal from the 352nd District Court
Tarrant County, Texas
Trial Court No. 352-300659-18

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

This is an interlocutory appeal from the dissolution of an agreed temporary injunction. Appellee Sinclair Holdings, LLC owns a ninety-year-old sixteen-story building (the Sinclair Building) in downtown Fort Worth on which it has spent tens of millions of dollars on renovations to transform the building into a hotel. Appellant Ulysses Asset Sub I, LLC holds an easement that allows its lessees to place antennas for wireless communication on the roof of the Sinclair Building. The parties agreed to a temporary injunction after Ulysses sued claiming that Sinclair's construction plans would interfere with Ulysses' rights to utilize the roof and would disrupt the ability of the existing antennas on the roof to transmit emergency calls. That agreed temporary injunction permitted certain construction activities on the roof to go forward but prohibited the construction of a rooftop bar.

After several events occurred, including the relocation of a large air-conditioning cooling tower from the roof to an alley and the relocation of the antennas (of the only entity that had antennas located on the roof) on the parapet wall surrounding the roof, Sinclair moved to dissolve the temporary injunction. Ulysses objected to Sinclair's efforts to dissolve the agreed temporary injunction. The trial court conducted an evidentiary hearing, found that the circumstances existing at the time of the entry of the temporary injunction had changed, and dissolved the temporary injunction.

Ulysses raises two issues challenging that decision. We hold that based on the facts developed at the hearing, the trial court acted within its discretion to dissolve the temporary injunction. We therefore affirm.

## II. Factual and Procedural Background

### A. Sinclair's plans to renovate the Sinclair Building were met with opposition from Ulysses.

As alluded to above, the dispute involves the roof of the Sinclair Building. Sinclair acquired title to the building in 2013. Sinclair's predecessor-in-title had granted a party affiliated with Ulysses a "wireless communication easement and assignment agreement" (the Easement Agreement) over the "building portion of the Property." The Easement Agreement also conveyed use as necessary for Ulysses to comply with its obligations under two preexisting leases. AT&T is a lessee under one of the preexisting leases.

In 2017, after a two-and-a-half-year approval process, Sinclair began renovating the Sinclair Building to transform it into a hotel. The renovation included structural and safety work on the roof, as well as plans for the construction of a rooftop bar. In 2018, Sinclair negotiated with Ulysses and proposed relocating AT&T's equipment so that Sinclair could construct the rooftop bar. Ulysses rejected the proposal, citing various sections of the Easement Agreement. Sinclair responded by informing Ulysses that it was going to shut down power to the Sinclair Building and proceed with construction anyway. Ulysses sent Sinclair a letter stating that this action would

3

constitute a breach of the Easement Agreement. Despite Ulysses' letter, Sinclair went forward with shutting down power to the Sinclair Building and with removing a portion of AT&T's equipment from the roof.

Ulysses responded by suing Sinclair for breach of the Easement Agreement. Ulysses sought a temporary restraining order (TRO) and injunctive relief, arguing that a TRO was necessary to prevent the interruption of emergency 911 calls and first-responder and rescue services.

## B. The trial court entered an agreed temporary injunction.

The trial court granted the TRO and scheduled a temporary-injunction hearing. Before the temporary-injunction hearing occurred, the parties filed a joint motion for the trial court to enter an agreed temporary injunction. In accordance with the joint motion, on July 18, 2018, the trial court signed a temporary injunction that initially recited the nature of the irreparable injury that it claimed would result from Sinclair's construction of the proposed rooftop bar:

> [Ulysses] and [Sinclair] are parties to a Wireless Communication Easement and Assignment Agreement (the "Easement Agreement") that is the subject of this dispute. [Ulysses] has alleged that immediate and irreparable injury, loss[,] and damage will result to [Ulysses] if [Sinclair] is allowed to proceed with certain construction on the Premises prior to a final adjudication of [Ulysses'] rights under the Easement Agreement. [Ulysses] alleges that such damage includes, without limitation, the potential interruption of telecommunications services that could, in turn, affect emergency 911 calls, first[-]responder and rescue services, and damage to customer relationships and destruction of leasing opportunities.

4

The temporary injunction then described how it would protect Ulysses and recited, in part, that the removal of the AT&T equipment could interrupt emergency 911 calls and first-responder and rescue services:

> Only the entry of a Temporary Injunction will serve to adequately protect [Ulysses'] alleged rights under the Easement and prevent imminent and irreparable injury that [Ulysses] alleges may arise in the event the people using AT&T wireless services in and around downtown Fort Worth are unable to place 911 emergency calls and receive first[-]responder and rescue services, such as local police, fire[,] and ambulance services.

The temporary injunction further stated that although Sinclair denied Ulysses' allegations,

> the parties have sought to resolve the immediate issue in such a manner that would allow necessary construction rooftop work to be performed without any interruption in cellular transmission service and/or to satisfy [Ulysses] that there will be no harm to [Ulysses'] alleged Easement Agreement rights. Following the issuance of the TRO, the parties continued these discussions, and the Court understands that the parties have come to an agreement on the terms of a limited injuncti[on] [that] protects [Ulysses'] interests while allowing [Sinclair] to perform certain rooftop construction efforts. Accordingly, the parties request that the Court enter a limited injunction, and the Court finds that such a limited injunction is appropriate[.]

Thus, the trial court enjoined Sinclair from constructing the rooftop bar (with the exception of constructing certain drains) while specifically allowing Sinclair to (1) temporarily relocate AT&T's antennas at Sinclair's cost; (2) complete structural steel work on the roof; (3) replace the roof membrane; and (4) complete other work related to the safety, repair, and maintenance of the roof.

5

The temporary injunction set the case for trial during the week of May 13, 2019, and concluded with the statement, "Nothing in this agreement shall bar either party from seeking rescission or modification of this order."

## C.  Sinclair moved to dissolve the temporary injunction.

Several months after the temporary injunction was signed, Sinclair filed a motion to dissolve it.  Sinclair argued that since the entry of the temporary injunction, two things had occurred.  First, the motion recounted the work that had been done:

> It has been more than three months since the Court issued the Temporary Injunction.  In that time[,] Sinclair has performed much work on the roof, which has involved dozens of construction works performing extensive steelwork to reinforce the structure. . . .  Sinclair also relocated the mechanical HVAC units from the roof to newly-constructed platforms in the alley next to the Property. . . .  Additionally, Sinclair worked with AT&T to move the cellular antennas a few feet on the exterior of the roof's parapet wall[] and moved a rack of telecommunication equipment to the interior easement space on the eighth floor of the Property. . . .  *None of this work damaged AT&T's equipment or interfered with AT&T's cellular network.*  Indeed, there has been *no* indication that anyone—let alone first responders in emergencies—experienced any interruption in cellular service as a result of this construction.

Second, the motion stated, "Since the Temporary Injunction was issued, Sinclair has been able to examine the AT&T Lease more closely.  This document confirms that AT&T is the only wireless provider whose equipment could be on the roof of the Property until 2032—at the earliest."  In other words, further study of a document—which Sinclair apparently had in its possession before agreeing to the injunction—

6

produced this revelation. Thus, according to Sinclair, the two bases for the temporary injunction were no longer an issue.

**D.  The trial court held an evidentiary hearing on Sinclair's motion to dissolve.**

The trial court conducted an evidentiary hearing on Sinclair's motion to dissolve and heard testimony from a representative of each party.

The relocation of AT&T's antennas and of other equipment previously located on the roof was one focus of the testimony. The evidence demonstrated that the antennas had been relocated to the parapet wall surrounding the roof. The antennas were relocated by a contractor for AT&T after the temporary injunction was entered. Units powering the antennas had also been moved with the approval of AT&T. The antennas and the units powering them were apparently the only equipment that AT&T and Ulysses were utilizing at the time of the hearing.

Sinclair's witness also traced the history of equipment and structures located on the roof and explained what Sinclair had planned to put on the roof if the temporary injunction were dissolved. The witness described the preexisting situation as follows:

> We had a massive chill water cooler, which is [a] pretty large structure, and a bunch of steel pipe, a big 12-inch steel pipe, that brought chill water and supply in return, and several fans, exhaust fans, that served bathrooms in the building. So, the roof was cluttered with a lot of this mechanical equipment.

A diagram of the preconstruction state of the roof, including the position of AT&T's antennas, was admitted into evidence, and it is reproduced below (with the antennas shown by boxes appearing around the perimeter of the roof):



EXISTING BUILDING
CONDITIONS

According to Sinclair's representative, neither AT&T nor Ulysses had ever complained about the preexisting presence of the air-conditioning equipment on the roof. It appears that the antennas placed on the building under the original lease with AT&T had occupied the same basic positions since 1996. The following is a diagram of the locations of the antennas from that lease with the position of the antennas apparently hand-drawn on the diagram:

8

EXHIBIT "A"

Attached to and made a part of that certain Lease Agreement dated _November 1_, 1996, by and between Reaut Corporation, a Texas Corporation, Lessor, and Dallas SMSA Limited Partnership, Lessee.

Next, Sinclair introduced a diagram of its plans for the roof that apparently depicted the completion of the work permitted under the temporary injunction, the relocated AT&T antennas, and the proposed location of the rooftop bar. That diagram is reproduced below:

9



REVISED BUILDING
CONDITIONS

As explained above, Sinclair relocated the large air-conditioning cooling tower from the roof to a structure built in an alley between the Sinclair Building and an adjoining building.

Ulysses offered the testimony of its regional director of operations, whose region included the Sinclair Building. On direct, this witness testified that Ulysses had the right under the Easement Agreement to lease the roof not only to wireless-telephone providers but also to other types of wireless-communication providers.

10

Ulysses' witness explained that accommodating other users might require different utilization of the roof than had occurred in the past. He also noted that antennas produce RF waves,[1] which create potential health problems for people who are exposed to the waves.

On cross-examination, Ulysses' witness clarified that the AT&T antennas were directional antennas that were focused away from the building and were not pointed toward the proposed rooftop bar. Ulysses' representative was unaware of where AT&T had relocated its antennas and was unaware of what steps had been taken to move AT&T's antennas. Though the antennas had been knocked offline by construction activities the prior summer (during the time frame when the temporary injunction was entered), the witness was unaware of any issues since that time. The witness was also unaware of any situation in which a person had made a 911 call and was unable to reach an operator.

Finally, Ulysses' representative had the following exchange with Sinclair's counsel about whether Ulysses had any existing plans to place additional antennas on the roof or had ever had plans to utilize the space to be occupied by the proposed rooftop bar:

> Q. Since the time it has been within your purview, has . . . Ulysses ever proposed to put an antenna of any sort in the area where the bar is shown in Exhibit 3?

---

[1]This term "RF waves" was not defined in the record.

11

A. I'm unaware.

Q. Are you aware of any intent at present time to place any antennas other -- on the rooftop of the Sinclair, other than those that are shown on Exhibit 3 [the diagram showing the bar's planned location] that are being currently used by AT&T?

A. Again, unaware.

## E. The trial court expressed concern that the circumstances warranting the temporary injunction had changed and then made its ruling.

When the testimony ended, the trial court asked whether one of the initial allegations in the request for temporary injunctive relief "was . . . that 911 service could be knocked down" and further asked, "And haven't we now heard evidence that that's not the case? So, isn't that a substantial change?" Ulysses' counsel responded that the temporary injunction was based on several types of irreparable harm, that the signal had been interrupted once, and that it could happen again.

When asked if 911 service had gone down, Ulysses' counsel responded "no" but emphasized a need for redundancy in the 911 system. Ulysses' counsel then focused his argument on what he contended was the sole basis for Sinclair's motion:

> So, the only thing that they claim is [that] AT&T is the only entity that can be on top of the roof that would have -- would need these services. We know that's not the case. That's not the case from looking at the documents. That's not the case because we know that people have been -- were on the roof even at the time they bought the property. I mean, it's just clearly not the case. That's the sole argument they made for changed circumstance[,] and that's just wrong.

Sinclair responded that the antennas had been amicably moved and that there was no longer a threat to 911 services. Sinclair's counsel also argued that Ulysses had a duty

12

as the easement holder not to interfere with Sinclair's rights and that the rooftop bar could be constructed because the renovation efforts had relocated the equipment that had been on the roof and that the parties had coexisted with for years:

> For years they have used the rooftop for air-conditioning purposes and storage purposes without any objection whatsoever. Now, at their own great expense, they moved all that off so they can replace that space with a rooftop bar[,] and suddenly it becomes an issue.

Sinclair described any harm that might result from constructing the rooftop bar as hypothetical and explained that if it did not prevail on final trial, then the bar would have to be torn down.

The trial court ruled from the bench that it was going to grant the motion to dissolve, stating, "As it relates to the injunction, I do not find that there is a risk of imminent harm, so I will dissolve the temporary injunction." The trial court then signed an order dissolving the temporary injunction; the order included a finding that "conditions have changed since the temporary injunction was first entered such that the injunction is no longer necessary or proper." Ulysses' interlocutory appeal followed. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4).

### III. Standard of Review

#### A. The general standard of review is abuse of discretion.

"Our review of the trial court's order of dissolution is limited to the narrow question of whether the trial court's action in dissolving the injunction constituted a clear abuse of discretion." *Murphy v. McDaniel*, 20 S.W.3d 873, 877 (Tex. App.—

Dallas 2000, no pet.). The tests to determine whether a trial court has acted within its discretion vary depending on whether we are reviewing that court's factual or legal determinations:

> With respect to factual matters, a trial court abuses its discretion if, under the record, it reasonably could have reached only one decision, and it failed to do so. *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding). With respect to the application of the law, a trial judge has no discretion in determining what the law is or in applying the law to the undisputed facts, and a clear failure by the court to correctly analyze or apply the law will constitute an abuse of discretion. *See id.*

*Tex. Voices for Reason & Justice, Inc. v. City of Argyle*, No. 02-16-00052-CV, 2017 WL 1173837, at *2 (Tex. App.—Fort Worth Mar. 30, 2017, no pet.) (mem. op.); *see also Health Care Serv. Corp. v. E. Tex. Med. Ctr.*, 495 S.W.3d 333, 338 (Tex. App.—Tyler 2016, no pet.) (op. on reh'g) ("The trial court does not abuse its discretion if some evidence reasonably supports the trial court's decision. More specifically, the trial court does not abuse its discretion when it bases its decision on conflicting evidence, or when some evidence of substantive and probative character exists to support its decision." (citation omitted)).

Here, the parties expend considerable effort arguing which of two legal standards the trial court should have applied in determining whether to dissolve the temporary injunction. As we discuss below, the standard applied by the trial court was the more strenuous of its options. We conclude that the trial court's determination under the more strenuous standard has sufficient factual support to

14

warrant the trial court's exercise of its discretion. Thus, Ulysses cannot complain about the trial court's legal determination of which standard to apply because that court placed a higher burden on Sinclair and chose the standard that Ulysses advocates. We will discuss but not belabor the disagreement about which standard applies; after doing so, we conclude that the facts before the trial court support its determination that a change of circumstances had occurred.

**B. The open question is whether a trial court retains broad discretion to dissolve a temporary injunction simply because it is an interlocutory order or whether the party seeking to dissolve the temporary injunction must show a change of circumstances.**

A temporary injunction is a specific type of interlocutory order that acts "to preserve the status quo of the litigation's subject matter pending a trial on the merits." *Savering v. City of Mansfield*, 505 S.W.3d 33, 39 (Tex. App.—Fort Worth 2016, pet. denied) (op. on en banc reconsideration) (citing *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (op. on reh'g)). The conflict of which standard applies to the dissolution of a temporary injunction arises from the following clash: whether the general rule—that a trial court has broad discretion to alter its interlocutory orders—applies or whether a more tailored rule—which requires a showing of a change of circumstances between the time of the entry of the temporary injunction and a motion seeking its dissolution—should apply in the unique context of temporary injunctions.

Those advocating for a rule that vests the trial court with broad discretion to control its interlocutory orders often cite the Austin court's opinion in *Tober v. Turner*, 668 S.W.2d 831, 836 (Tex. App.—Austin 1984, no writ). *Tober* has nuggets that both sides of the debate can highlight. The opinion includes statements that seem contrary to a view that a trial court has unbridled discretion to dissolve a temporary injunction. One such statement is that the purpose of a motion to dissolve is "to provide a means to show changed circumstances or changes in the law that require modification or dissolution of the injunction; the purpose is not to give an unsuccessful party an opportunity to relitigate the propriety of the original grant." *Id.* But after articulating why a motion to dissolve should not be used to relitigate the original grant of a temporary injunction, *Tober* pivots in a different direction and states, "We should not be understood to say that a trial court lacks the authority to reverse its prior temporary[-]injunction order absent a showing of changed conditions; it does have that power." *Id.* at 835.

Some courts appear to view the last-quoted statement as holding that a trial court has broad authority to dissolve an injunction. *See, e.g.*, *Roberts v. Roberts*, No. 10-05-00134-CV, 2006 WL 301099, at *3 n.5 (Tex. App.—Waco Feb. 8, 2006, pet. denied) (mem. op.) ("A trial court also retains the inherent authority to dissolve an injunction absent a showing of changed circumstances." (citing *Tober*)). Other courts view *Tober* in its context of dealing with whether a party waives its right to seek dissolution of a temporary injunction by not appealing the original grant of the

16

injection.  *See, e.g.*, *BS & B Safety Sys., Inc. v. Fritts*, No. 01-98-00957-CV, 1999 WL 447605, at *2 (Tex. App.—Houston [1st Dist.] June 17, 1999, no pet.) (not designated for publication) (op. on reh'g).  In *BS & B Safety's* view, *Tober* states a rule that a trial court has no duty to reconsider the granting of a temporary injunction absent a showing of changed circumstances, but *Tober* "did not impose a per se rule that a trial court abuses its discretion if it chooses to reconsider the granting of a temporary injunction absent a showing [of] a changed circumstance[]."  *Id.*

A third view focuses on the authority cited in *Tober* for its broad pronouncement that a trial court may reverse a prior interlocutory order absent changed circumstances and challenges whether that authority supports the broad reading that *Tober* gave it.  *See, e.g.*, *Murphy*, 20 S.W.3d at 877.  *Tober* relied on *City of Hudson v. Ivie*, 592 S.W.2d 658 (Tex. App.—Beaumont 1979, no writ), and as the Dallas court in *Murphy* noted, *Ivie* involved a situation in which the appellate court had the jurisdiction to review the original grant of the temporary injunction, and "[t]he court of appeals'[s] determination that the trial court had the authority to dissolve its previously granted temporary injunction was, in reality, a determination that the temporary injunction had been improperly granted."  20 S.W.3d at 879.  *Murphy* then held that if the appellate court lacks the jurisdiction to review the original grant of the temporary injunction, a temporary injunction should remain in effect unless a party shows a change in circumstances:

17

> We do not have jurisdiction to consider the propriety of the trial court's decision to grant the temporary injunction. Rather, we must presume the trial court's initial decision to grant the temporary injunction was proper. *See Tober*, 668 S.W.2d at 834. Because we must recognize the trial court properly granted the temporary injunction, we conclude that, absent changed circumstances, the temporary injunction should remain in effect until a final disposition of the parties' claims.

*Id.*; *see Roberts*, 2006 WL 301099, at *4 (Gray, C.J., concurring and dissenting) (analyzing *Tober* and *Murphy* and noting that "[t]he law applicable to the dissolution of a temporary injunction is not entirely clear"); *see also Jackson v. Cox*, No. 03-17-00846-CV, 2018 WL 3677888, at *2 (Tex. App.—Austin Aug. 3, 2018, no pet.) (mem. op.) (citing *Tober* for the general proposition that "[t]he trial court is authorized to dissolve a temporary injunction upon a showing of changed circumstances").

Here, the trial court did not wade off into the controversy of how to interpret *Tober* but instead based its decision on a finding of changed circumstances. As set forth above, the trial court specifically noted that it was dissolving the temporary injunction because it found "that conditions have changed since the temporary injunction was first entered such that the injunction is no longer necessary or proper." Because we hold that the trial court did not abuse its discretion by finding changed circumstances existed, we need not choose between the various interpretations of *Tober*'s scope.

## C. A party can establish a change of circumstances in a variety of ways.

A number of cases define the changed circumstances that permit the dissolution of a temporary injunction as "conditions that altered the status quo after

the temporary injunction was granted or made the injunction unnecessary or improper." *See In re Estate of Cobb*, No. 09-13-00348-CV, 2013 WL 6705991, at *2 (Tex. App.—Beaumont Dec. 19, 2013, no pet.) (mem. op.); *see also In re Guardianship of Stokley*, No. 05-10-01660-CV, 2011 WL 4600428, at *3 (Tex. App.—Dallas Oct. 6, 2011, no pet.) (mem. op.) (same); *In re Graybar Elec. Co.*, Nos. 13-08-00073-CV, 13-08-00294-CV, 13-08-00333-CV, 13-08-00341-CV, 2008 WL 3970865, at *14 (Tex. App.—Corpus Christi–Edinburg Aug. 26, 2008, orig. proceeding) (mem. op.) (same); *Henke v. Peoples State Bank of Hallettsville*, 6 S.W.3d 717, 721 (Tex. App.—Corpus Christi–Edinburg 1999, pet. dism'd w.o.j.) (same), *abrogated on other grounds by Tex. Wrecker Serv. v. Resendez*, Nos. 13-16-00515-CV, 13-16-00698-CR, 2017 WL 711642, at *4–5 (Tex. App.—Corpus Christi–Edinburg Feb. 23, 2017, no pet.) (mem. op.).

Stated another way, "[a] motion to dissolve a temporary injunction is a way to show changed circumstances, changes in the law, or fundamental error [that] has occurred in the issuance of the injunction." *Reiss v. Hanson*, No. 05-18-00923-CV, 2019 WL 1760360, at *2 (Tex. App.—Dallas Apr. 22, 2019, no pet.) (mem. op.). Amplifying on what constitutes a changed circumstance, another court described the requirement as necessitating "newly revealed facts." *See Sewell v. Hardriders, Inc.*, No. 14-12-00541-CV, 2013 WL 3326798, at *2 (Tex. App.—Houston [14th Dist.] June 27, 2013, no pet.) (mem. op.).

# IV. Analysis

In two issues, Ulysses argues (1) that the trial court abused its discretion by dissolving the temporary injunction because Sinclair failed to present evidence of changed circumstances to justify dissolving the temporary injunction and (2) that the trial court abused its discretion by allowing Sinclair to relitigate the propriety of the original grant of the temporary injunction through Sinclair's attack of the elements of irreparable harm and encroachment on Ulysses' easement rights. Because both issues challenge the propriety of the trial court's order dissolving the temporary injunction, we discuss them together along with the various arguments raised within the two issues.

## A. We conclude that the facts permitted the trial court to exercise its discretion and to dissolve the temporary injunction.

Ulysses argues that Sinclair's motion to dissolve was an attempt to wriggle out of a compromise that it no longer wanted to abide by. Ulysses' specific challenges to the trial court's ruling include that no newly discovered facts were introduced and that testimony was so scant that even if new facts were hinted at, they were not fully developed in this record. We agree that the record is thin. But we disagree that not enough facts were developed to permit the trial court to exercise its discretion and to dissolve the temporary injunction. As we noted in our initial discussion of the standard of review, we are not dealing with a legal question of what standard to apply; the trial court applied the standard that Ulysses advocated. Instead, we deal with the

question of whether the factual record is so lacking that we must conclude that the trial court abused its discretion, i.e., "if, under the record, [the trial court] reasonably could have reached only one decision, and it failed to do so." *See Tex. Voices for Reason & Justice, Inc.*, 2017 WL 1173837, at \*2.

The sole question before the trial court was whether the evolving conditions had altered the status quo after the temporary injunction was granted or had made the temporary injunction unnecessary or improper. Here, the trial court had a mix of facts that in some instances melded assumptions about what might occur with what later became reality. It was undisputed that AT&T had moved its antennas and that no one knew of any disruption in 911 calls that had occurred after the antennas were moved.[2] Ulysses' representative was careful not to say that no disruption had occurred, but it was a fair inference by the trial court that Ulysses' representative would know if any disruptions had occurred. Admittedly, the temporary injunction explicitly contemplated moving the antennas. Were the only alleged changed circumstance the successful relocation of AT&T's antennas, we might hesitate to conclude that this in and of itself was a newly revealed fact supporting a finding of a change in circumstances.

But on top of the successful relocation of AT&T's antennas, the record also establishes that the trial court heard for the first time that Sinclair's work on the roof

---

[2]*See, e.g.*, *Frey v. DeCordova Bend Estates Owners Ass'n*, 647 S.W.2d 246, 248 (Tex. 1983) (stating that an actual—not conjectural or speculative—irreparable injury was necessary to support the granting of injunctive relief).

and its plan to install a rooftop bar left the roof no more crowded with structures than it had been historically. Specifically, the drawings dating from the original installation of the AT&T antennas, the configuration of the roof structures before renovation began, and the configuration of the proposed rooftop bar supported an inference that if the roof were developed as Sinclair had planned, the construction of the rooftop bar would not alter the status quo of the physical configuration of the roof as it had previously existed—apparently for decades—before Ulysses filed its lawsuit. In essence, the testimony at the hearing on Sinclair's motion to dissolve the temporary injunction revealed that Sinclair's roof renovations, which were partially implemented after the entry of the temporary injunction, had traded the space previously occupied by air-conditioning equipment for space to be used by the rooftop bar.

And on top of this, Ulysses' representative answered that he knew of no plans to install any additional antennas on the roof. Based on his job title, it is a reasonable inference that if such plans had existed, he would have known of them. Thus, the record supports the trial court's decision that as the situation had evolved, the changes implemented and contemplated to the roof had not materially changed its configuration and did not disrupt any existing use that Ulysses presently had for the easement.

With the record that we have before us, the trial court had a factual basis to conclude that the irreparable injuries envisioned by the temporary injunction had not come to pass and that it was not reasonable to conclude that they would occur before

a final trial of this matter. Overall, the AT&T antennas, after being relocated, functioned without any reported disruptions to 911 calls, as reported by the two entities that it is reasonable to assume would have heard of them. AT&T's antennas had occupied the same relative position for decades, and Ulysses would continue to have approximately the same amount of space that had previously existed to service AT&T as its present lessee. Certainly, there might be future lessees, but at the time of the hearing on the motion to dissolve, Ulysses was unaware of any plans to install any additional antennas.

A final trial may produce the result that the rooftop bar conflicts with Ulysses' easement rights, and Sinclair acknowledged that a final decision in this case might go against it and require removal of the bar. That is Sinclair's gamble. But the question before the trial court and this court is whether the facts that had evolved since the entry of the temporary injunction had altered the status quo and had made the temporary injunction unnecessary. That evolution supported a view that the two injuries that the temporary injunction was designed to prevent would not occur between the time of the hearing on the motion to dissolve and the final trial. The record supports a decision that 911 calls were not being disrupted after the antennas' relocation and that the roof, even with the proposed rooftop bar, provided Ulysses with the same amount of space that had previously been available to it should a need arise for additional space to accommodate new antennas (even though there were no plans to locate any additional antennas on the roof at the time of the hearing).

23

Perhaps some of these consequences were envisioned at the time of the entry of the temporary injunction, but the overall picture of the effect of the rooftop bar's planned construction had been created since the entry of the temporary injunction.

And to reiterate, our holding has no prognosticative effect on the final hearing in this matter. The limited temporal effect of our ruling and of the trial court's ruling on the motion to dissolve causes us to reject Ulysses' argument about the dire consequences of allowing construction of the rooftop bar to proceed. Ulysses certainly challenges this view and argues that

> [b]y allowing the bar to be constructed, at best, the easement has been reduced in size and, at wors[t], the opportunity created by and paid for under the terms of the easement has been permanently lost. Certainly leasing opportunities have been lost, which is the exact harm the Agreed TI was intended to protect against.

But based on the record, there are two sides of the coin. The facts adduced at the hearing show that the roof renovations that have been completed have not resulted in the anticipated harm to 911 services and have not overtaken Ulysses' easement because the rooftop bar would occupy the space previously occupied by the air-conditioning cooling tower that has been relocated. From its perspective, Ulysses argues that this state of affairs presents a side of the coin that shows dire consequences from the dissolution of the injunction. The trial court saw another side of the coin: as events had evolved since the entry of the injunction, the consequences of constructing the rooftop bar placed Ulysses in no more dire a condition than had

24

long existed. The trial court chose a side of the coin that Ulysses disagrees with, but the existence of the choice placed the decision within the discretion of the trial court.

**B. The parties make additional arguments that we reject or do not reach.**

The basis for our holding—that the facts adduced at the hearing provided a factual basis for the trial court to exercise its discretion and to dissolve the temporary injunction—is narrow. The parties make a number of arguments that are not pertinent to our narrow holding, but for the sake of thoroughness, we address them. We conclude that the parties' remaining arguments are either unpersuasive or go beyond what we can and should decide in an interlocutory appeal with only the thin record before us. Stated briefly, our view of the parties' remaining arguments is as follows:

- Ulysses spends a large portion of its brief challenging Sinclair's claim that a changed circumstance is the discovery of the limitations of Ulysses' leasing rights because AT&T has exclusive rights until 2032. We agree with Ulysses but do not find its argument dispositive. Sinclair had long had access to the lease that was in its chain of title and acknowledges that the parties had been negotiating for months before litigation commenced. Under the facts presented here, a newly-discovered interpretation made by further contemplation of long-held documents does not constitute a changed circumstance. But as set forth above, the record presents other changed circumstances.

- Sinclair relies on the concluding phrase of the temporary injunction—"[n]othing in this agreement shall bar either party from seeking rescission or modification of this order"—to argue that this language gave the trial court carte blanche to dissolve the temporary injunction. That argument reads too much into the language. The clause does not convey that the parties agreed to adopt any other standard than what the law otherwise requires when a party seeks to dissolve a temporary injunction, nor does the clause give the trial court the discretion to dissolve the injunction under any circumstance. We decline to adopt Sinclair's broad reading of this clause.

- Both parties appear to seek some guidance from this court about their correlative rights created by the Easement Agreement or as holders of the dominant and servient estates under the easement. We will not make an advanced ruling on the construction of the documents in this case or the disputes that should receive a full examination at a final hearing. As noted above, we have before us only tens of pages of testimony, a few pictures and diagrams, and the Easement Agreement and a few of its underlying documents. Our review of any ruling on the extent of the easement should be based on a more complete record than we have in this interlocutory appeal. *See Dall./Fort Worth Int'l Airport Bd. v. Ass'n of Taxicab Operators, USA*, 335 S.W.3d 361, 364 (Tex. App.—Dallas 2010, no pet.) ("[A] party

may not use an appeal of a temporary injunction ruling to get an advance ruling on the merits.").

Because further analysis of the above arguments is not necessary to our disposition of the appeal, we do not address them further. *See* Tex. R. App. P. 47.1.

## C. We dispose of both issues simultaneously.

Because we have held that the record supports a finding of changed circumstances and that the trial court therefore did not abuse its discretion by dissolving the temporary injunction, we overrule Ulysses' two issues.

## V. Conclusion

Having overruled Ulysses' two issues, we affirm the trial court's order dissolving the temporary injunction.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: October 10, 2019

27